MOUNTAIN COPPER CO., Limited, v. UNITED. STATES.

(Circuit Court of Appeals, Ninth Circuit. February 26, 1906.)

No. 1,203.

1. UNITED STATES—STATUS AS LITIGANT—SUIT AS PROPERTY OWNER.

When the United States comes into a court asserting a property right, it occupies the same position as any other suitor, and its rights are the same.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. United States, § 112.]

2. NUISANCE—SUIT FOR ABATEMENT—DISCRETION OF COURT.

Where an owner of property cannot use the same at all without indirectly injuriously affecting the property of another, the sound discretion of a court of equity is invoked when it is appealed to and asked to abate such use as a nuisance.

3. SAME.

Where it is sought to enjoin a lawful business as a nuisance, the court will consider the comparative injury which will result from the granting or refusing of an injunction, and it will not be granted where it would be inequitable and oppressive, as where it would cause a large loss to defendant or others, while the injury, if it is refused, will be comparatively slight and can be compensated by damages.

4. SAME—OPERATION OF COPPER SMELTER—DAMAGE FROM FUMES.

Defendant operated copper mines and a smelter, in which it had invested over $5,000,000 and employed over 1,000 men, producing about 10,000 tons of copper per year, and disbursing over $1,000,000 in wages in a mountainous locality previously practically uninhabited. Defendant paid about one-sixth of the taxes of the county and operated its smelter by the most approved methods that were practicable. Complainant, the United States, owned some 4,000 acres of land in the vicinity, sparsely covered by small trees, the greater part of which had been killed by the sulphurous fumes from the smelter. The land was rocky, unfit for cultivation, and of small value, having been subject to entry under the homestead and pre-emption laws for many years without being taken, and the timber was of no commercial value. It was shown that the area of injury from the smelter fumes was not increasing. Held, that a court of equity, in the exercise of its discretion, would not grant an injunction restraining defendant from operating its smelter as a nuisance, but would leave complainant to its remedy at law.

Hawley, District Judge, dissenting

Appeal from the Circuit Court of the United States for the Northern District of California.

The appellee was the complainant in the court below, and in its bill alleges that the defendant to the suit, appellant here, is a corporation engaged in the business of operating certain mines on section 34, township 33 N., range 6 W., M. D. M., and elsewhere in the neighborhood thereof, and of mining, roasting, burning, smelting, and refining copper and other ores mined therefrom, its works being on section 18, township 32 N., range 5 W., M. D. M., and upon other land near thereto; that the complainant was at the times mentioned in the bill, and still is, the owner and in the possession of certain tracts of land, with the trees and timber thereon, adjacent to and near the mines and works of the company, including all of township 32 N., range 5 W., M. D. M., except certain parts of section 18 thereof, and including also sections 1, 2, 4, 6, part of 7, 8, 10, 11, 12, 13, 14 part of 15, part of 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, part of 27, 28, 29, 30, 31, 32, 33, part of 34, 35, and 36 of township 33 N., range 6°W. M. D. M., which land was prior to January 1, 1896, and, except as stated in the bill, is still covered with and

valuable for the trees and timber standing and growing thereon; that the defendant company has so conducted its said business, and continues and threatens to continue to so conduct it, that the sulphurous and arsenical fumes and smoke produced by roasting and burning its ores have greatly injured and destroyed, and still are injuring and destroying, vast quantities of the said trees and timber, rendering valueless the lands on which they are standing and growing, to the complainant's irreparable damage.

The defendant company in its answer denies that the complainant is, or was at the times stated in the bill, the owner or in possession of the odd-numbered sections in township 32 N. of range 5 W., M. D. M., or of any of sections 16 or 36 in that township, or of the S. W. ¼ of the S. E. ¼ and the S. E. ¼ of the S. W. ¼ of section 20 in township 32, or of sections 25, 27, 34, 35, and 36 of township 33 N. of range 6 W., M. D. M.; and as to the remaining lands described in the bill the defendant admits that the complainant is the owner and in the possession of the greater portion of them, but avers that it has not the knowledge or information sufficient to enable it to admit or deny the alleged ownership and possession of the respective tracts, and therefore prays that the complainant's alleged title thereto and possession thereof may be established by competent proof. The answer admits that all, or nearly all, of the land described in the bill was, prior to January 1, 1897, and, except as otherwise stated therein, covered with a thin growth of trees and bushes, but denies that it is or ever was valuable for any such trees, timber, or other growth thereon; that all of the said land owned by the complainant is and always was waste, mountainous, and desert land; that the surface is rough and broken, composed mainly of granite, partly covered with thin and barren soil; that the vegetable growth upon it consists and always has consisted principally of digger pine trees and manzanita and other bushes, and has not, and never had, any value as timber, or for any other purpose but fuel; and that it has not and never had any value or market as fuel, except the market afforded by the defendant's smelting works; that for fuel or for any other purpose the value of the trees and other growth upon the complainant's said land is not, and never was, greater than $1 an acre. The answer admits that the defendant is, and ever since January 1, 1897, has been, conducting upon its own lands the business alleged in the bill, and that sulphurous fumes and smoke have been and are generated and produced by roasting and burning its copper and other ores, and that by the action of such sulphurous acid it has injured and destroyed the trees and vegetation which on January 1, 1897, were standing and growing upon a portion of the lands described in the bill, to wit, portions of sections 5, 6, 7, 8, 9, 16, 17, 18, 19, 20, 21, 28, 29, and 30 in township 32 N. of range 5 W., M. D. M., but denies that it has thereby rendered the said lands valueless, or permanently or irreparably or at all injured the same, or damaged the complainant, and denies that by its said operations, or at all, it has injured or destroyed, or is injuring or destroying, or will injure or destroy, any trees, timber, or vegetation upon any of the land embraced by the bill, except the portions of the sections last specifically described.

Further answering, the defendant denies that in its operations any arsenical fumes or gases are produced, or any other injurious fumes than sulphurous acid gas; that its mines in the aforesaid section 34 consist of a large deposit of low-grade copper sulphide ore, containing small quantities of gold and silver, which ore it brings from its mines to its kilns, smelting furnaces, and reduction works erected on the said section 18 by means of a railroad 12 miles long, owned by it, and known as the "Iron Mountain Railroad"; that the ore contains no arsenic, but from 30 to 50 per cent. of sulphur; that this ore is reduced at the defendant's works at Keswick to copper matte, or crude copper, containing from 70 to 80 per cent. of metallic copper, and is then shipped by rail to the defendant's refining works at Jersey City, N. J., where it is refined and separated, and the metals produced then marketed in New York; that in order to prepare the ore for treatment in roasting furnaces, and thereby to obtain metallic copper therefrom, it is necessary to first expel a considerable portion of the sulphur, which is done by burning the ore in kilns, or in heaps upon the ground; that this preliminary burning in heaps

or kilns is carried on upon the defendant's land in said section 18, near its furnaces, and the sulphurous fumes arising from this burning, as well as from the roasting furnaces, are the fumes sought to be enjoined by the complainant; that no process exists whereby such ores can be worked, and the metals therein contained extracted, other than the said process of burning and roasting out the sulphur as so practiced by the defendant, and that no process exists or is known to science whereby the sulphurous acid gas generated by such burning can be neutralized or condensed; that similar deposits of copper sulphide ore have for many years been worked and reduced in other places, as, for instance, at the Anaconda mines in Montana, the Rio Tinto mines in Spain, and the Mt. Lyell district in Tasmania, and that in all of those places, and wherever such ores occur, they are reduced by burning the sulphur substantially as done by this defendant, and without condensing or neutralizing the fumes; that if an injunction should be granted restraining the defendant from roasting or burning its copper ores in the open air, without condensing or otherwise disposing of the sulphurous fumes generated thereby, it would necessarily prevent this defendant from mining and reducing its ores at all, and would render valueless its entire investment in the said properties, and would throw out of employment all of its employes; that in the month of December, 1896, the defendant purchased its said mines, smelter, and railway from the Mountain Mines, Limited, a corporation which had theretofore owned and operated them, paying to the Mountain Mines, Limited, therefor upwards of $5,600,000, and has since such purchase invested upward of $1,000,000 more in improvements and additions to the properties; that the defendant constantly employs more than 1,000 men at its said mines and smelters, and during the year 1898 disbursed in wages and the purchase of supplies in California $1,041,300, and that its outlay for food for its said employes in Shasta county during that year was $112,970, and that the total value of all the wood and timber on all of the complainant's lands affected by the said fumes is not, and never was, so great as the sum disbursed by the defendant in any two months since the year 1896 in feeding its said employes; that the defendant extracts from its mines and reduces at its smelter by the processes complained of about 1,000 tons of metallic copper in each month, besides some gold and silver, and pays high railroad freight charges on this metal to New Jersey, and furnishes employment there to many men in its refining; that in addition to the men employed by the defendant and to the merchants from whom it purchases its supplies, all of whom are supported partly or wholly by its operations, many small quartz mines of low-grade gold ore are operated at a small profit near the defendant's works, by the sale of their ores to the defendant's smelters as a flux, and would be permanently closed if the defendant's smelters should be closed; that throughout Shasta county and elsewhere in California large and valuable deposits of similar sulphide ore exist, and are being opened and developed, as the result of the defendant's success in operating its said mines, and that the injunction sought in this action would forever destroy the value of said deposits and prevent their development or operation; that solely by reason of the product of the defendant's said smelters Shasta county has been in the past two years raised from the fifth or sixth rank to be the principal mining county in California, producing annually metals of greater value than any other county in the state; and that at the railway station at Keswick, which had no existence before the year 1896, when the defendant's smelters and railroad were built there, more freight is now received and shipped than at any other railway station in California, except San Francisco and Los Angeles, all of which freight and business is created by the defendant's operations, and will cease if they are enjoined; that the town of Shasta is within three miles and the town of Redding is within four miles of the defendant's smelters, and a United States Land Office has been maintained in one or the other of those towns for more than 40 years, during all of which period the lands that are owned by the complainant and described in the bill have been offered by it to pre-emption settlers for sale at $1.25 an acre, and to homestead settlers as a gift, and none of it has been settled upon or entered because it is absolutely worthless; that none of the said

land was ever listed by the Land Department of the government as timber land, chiefly valuable for its timber, nor was any of it ever entered or applied for as timber land at $2.50 per acre under the acts of Congress relative to such lands; that there are no profitable mines thereon; that when the defendant's smelters were ordered in 1896 the region about Keswick was practically uninhabited, but that thousands of dwellings have since been built there and inhabited by families and persons whose livelihood depends on the defendant's smelting operations.

In its answer the defendant admits that it is continuing to conduct its said business as stated, and that it intends to do so unless restrained by the court, but denies that the roasting or burning of its ores or other operations by the defendant will further injure or destroy any trees or timber upon the complainant's land, and avers that the injury to vegetation done or to be done thereby is confined, and always will be confined, to the ravine known as "Spring Creek Canyon" and some of its lateral branches, by the bounding ridges thereof; that the fumes soon reach the upper air and are diffused and rendered harmless at a comparatively short distance from the smelters, owing to the steady prevailing winds, the dryness of the atmosphere, and the broken and mountainous surface of the country; that the area in which vegetation has been injured is of an irregular oval shape, about four miles wide from east to west, and five miles from north to south, and that within that area all trees and vegetation except a few shrubs of no value were killed by the fumes in 1897; that no additional injury has been done nor any further area affected since 1897, and that no further injury can be done or is to be apprehended; that the affected area lies within the limits of the congressional grant to the California & Oregon Railroad Company, and that the defendant has purchased from the owner of that road and grant, and now owns and possesses, all the odd-numbered sections within the affected area; that in the course of its said operations in the reduction of ores the defendant has occasionally injured vegetation on lands owned by private persons in the vicinity of its works, and that at times the sulphur fumes produced by it have caused discomfort and annoyance to many people, but that defendant has always readily and amicably settled and paid all claims for injury or damage inflicted by it upon private persons, and that no proceedings were ever instituted against it by any one, except this action by which it is sought to enjoin its operations; that all injury done or that may be done to the complainant by reason of the fumes or other result of the defendant's operations is readily capable of pecuniary estimate and compensation, is very small in amount, and is in fact less than the revenues derived by the complainant each year as the direct result of the defendant's operations; that the defendant is ready, able, and willing, and has at all times been ready, able, and willing, and has offered and still offers, to pay to the complainant in cash the full amount of all injury and damage which it has caused or may cause the complainant by reason of any of the acts complained of in the bill, or, as complainant may elect, to purchase and pay for in cash at a fair valuation all standing trees and timber on the complainant's said lands, or to purchase and pay for in cash at a fair valuation all of the said lands of the complainant.

Evidence on behalf of the respective parties was given, and the case, as thus made, was submitted to the court below, resulting in a final decree perpetually enjoining and restraining the defendant to the suit "from roasting, burning and smelting copper or other ores at its smelting works at Keswick, Shasta county, Cal., without condensing or otherwise disposing of, before reaching open air, the sulphurous and arsenical fumes generated and produced thereby; provided, that the defendant may, at any time hereafter, apply to this court, upon due notice to the complainant, or the United States Attorney for the Northern District of California, for a modification or suspension of the injunction, upon a showing which the court may deem sufficient, that conditions have been so changed that the discharge of such sulphurous and arsenical or other fumes into the air, or any of them, may be resumed, or otherwise conducted so as not to create or continue, or contribute to create or continue, the nuisance complained of, or a nuisance of a similar character,

and so as not to injure or damage, or contribute to injure or damage, said complainant, or upon any other grounds satisfactory to the court." The appeal is from that decree.

Charles P. Eells and W. S. Goodfellow, for appellant.

Robert T. Devlin, U. S. Atty.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

In considering the case it is important to remember that the question to be determined is one between the United States and the defendant company only; the government suing, not in its sovereign capacity, but as a landowner, to enjoin alleged injuries to its property, not directly, but indirectly, through the maintenance of an alleged nuisance by the defendant on its own property. If other owners of land have been so injured by the same or similar acts of the defendant as to entitle them to an injunction, or to any other relief, it will be time enough to consider their grievances when they shall properly bring them before the court. Therefore the testimony of the numerous witnesses introduced on behalf of the complainant tending to show injury to fruit and other trees and things in Happy Valley, Shasta county, and upon other lands than those of the complainant, by reason of the fumes generated by the defendant company, is irrelevant to the case now presented, except in so far as it goes to show that the acts complained of by the complainant affect those persons in a similar manner, and, indeed, in a much greater degree.

It is the well-established law that, when the government comes into a court asserting a property right, it occupies the position of any and every other suitor. Its rights are precisely the same; no greater, no less. United States v. Clark (C. C. A.) 138 Fed. 294; United States v. Detroit Timber & Lumber Co., 131 Fed. 668, 67 C. C. A. 1; United States v. Flint, 4 Sawy. 42, Fed. Cas. No. 15,121; Foster's Federal Practice, § 63; United States v. Barker, 12 Wheat. 559, 6 L. Ed. 728; Mitchel v. United States, 9 Pet. 743, 9 L. Ed. 283; Brent v. Bank of Washington, 10 Pet. 615, 9 L. Ed. 547; United States v. Smith, 94 U. S. 217, 24 L. Ed. 115; Am. & Eng. Enc. of Law (2d Ed.) vol. 4, p. 271.

We are therefore to inquire, first, what are the injuries shown to have been sustained and that will be sustained in the future by reason of the acts already committed by the defendant, and that it threatens to continue? As has been said, all of them are indirect and grow out of the maintenance of an alleged nuisance on its own property. The defendant has not entered upon any of the land of the complainant and cut down or destroyed any of the trees, timber, or undergrowth thereon, or threatened to do so, as was done in the case of Northern Pacific Railroad Co. v. Hussey, 61 Fed. 231, 9 C. C. A. 463, cited by counsel from this court, and in which we said that to cut down, destroy, or carry away the timber standing upon land in which the complainant had an interest was "essentially to destroy and take away

the very substance of the estate. That an injunction will be awarded, in behalf of one showing the necessary interest in the property, to prevent such waste and destruction, is thoroughly settled." There is no doubt of the correctness of that ruling, or of a similar ruling in numerous similar cases cited by counsel for the appellee. The distinction between them and the case now under consideration is sufficiently obvious without elaboration. Here, as has been said, the appellant has never entered upon any of the land of the complainant, and cut down or destroyed any tree or underbrush, or otherwise directly interfered with the complainant's freehold. The acts of the appellant that are complained of were all committed on its own property. It is quite true that it is a maxim of the law that every one must so use his own property as not to interfere with that of another. But, where one cannot use his own property at all without indirectly injuriously affecting the property of another, then the sound discretion of the court of equity that is appealed to to abate the nuisance is invoked, and should be wisely exercised.

Looking at the record in the present case, we find the injuries that have been and that will be inflicted upon the land of the complainant involved in this suit are indicated in the following extracts from the testimony of Charles L. Reynolds and Lewis T. Wright, who seem to have been the only witnesses examined in respect to that important matter. Reynolds, having testified that he is a civil and mining engineer by profession, and a United States deputy mineral surveyor for the district of California, and was employed by the appellant to make an examination of all the lands of the complainant described in the bill that had been injured in any way, testified that he did so, spending about three weeks in such examination, his affidavit in respect to which was admitted in evidence without objection as to the form of proof. This witness was questioned and answered as follows:

"Q. How did you identify the source of injury in making this examination, Mr. Reynolds? A. By a personal examination of all trees that had been damaged. Incidentally, I may remark that it was possible a portion of the trees that I have reported as being killed or injured by smoke have been killed or injured from other causes. Q. Then your report contains a complete statement of all kinds of trees which have been killed or injured from any apparent cause. A. From any apparent cause. Q. Whether fumes or otherwise; and you simply assume that the fumes have done all the injury? A. I have gone to the limit. Q. What is the nature in general of the vegetation in that area? A. We have a digger pine tree and some small oaks, and there are some firs. They are all small. Q. Are any of the trees valuable for lumber? A. I never found any in that area, and the government reports, which I searched, reported them, with the exception of a very few cases, as being fit for firewood only. You will find that in my report. Q. You mean in your affidavit? A. In my affidavit. Q. Have any of the trees ever been listed by the government as timber land? A. There are one or two sections. I think that is all. If you will permit me to look at that affidavit, I can refresh my memory from it very easily, and save time. (After looking at affidavit) No, I think I can save time by looking at the map. I feel quite certain that there are no lands reported by the government as containing valuable timber that are within what I have termed the damaged zone on my map. Q. In your investigation did you see any lands that had any valuable timber upon them in the damaged zone? A. No, sir. I might state that the valuable timber does not come down below an elevation of 1,500 feet. You will find it to the north of

the property, and smoke does not get over in there. Q. All this area that you examined, then, is below the timber level? A. Is below that good timber level; yes, sir. Q. What is the nature of the soil? A. There is very little soil on most of the ground. What there is is rocky. Q. This soil is decomposed granite, is it not, in most of that area? A. Yes, sir. Q. And the hard granite is immediately below the top layers of softened material. A. Yes, sir. Q. Is the timber, such as it is, thick and luxuriant? A. You mean the good timber? Q. The timber on this land. You describe the quality of the timber as not being specially valuable. Is there much of it? A. Not a great deal. It is not a well-timbered country at all. Q. Was there anything to indicate there in your examination whether the area of injury was increasing or decreasing—what the tendency was? A. Yes, sir. Q. What did you find in that respect? A. I found that within the old killed zone, where the brush had been killed, that fresh brush was now springing up. In fact, if you wish my testimony regarding the last few days, I can go still further. In the town of Keswick, immediately underneath the smoke and exposed to the smoke, I saw where some trees had been planted, and I can recollect five at the present time, and they are growing very finely and freely. Q. How near is that to the smelter? A. That is within 1,500 feet of the stack from which most of the smoke is coming. Q. Then the result of your examination at that point— that is, of the lands we have already referred to—was such as to indicate to you that the area of injury is lessening, rather than increasing? A. Every month it is lessening in area. Q. Can you suggest any reason for that change, Mr. Reynolds? A. Yes, sir. Q. What is it? A. The ceasing on the part of the company of heap roasting, which was formerly carried on. There is no heap roasting done now, practically. Q. There is not roasting in heaps? A. No, sir. The smokes are all gathered through a furnace under the draught. They go out of a long stack, and are separated more thoroughly than they were before. Q. The original method of burning the ore there was to pile it in great heaps in the open air, and then burn those heaps? A. Yes, sir; there was no draught, and the smokes followed the tendency of their weight along the ground."

In the affidavit of this witness, which, as has been said, was introduced in evidence without objection to the form of the proof, he gives in detail the result of his examination of the lands of the complainant described in the bill that are within the damaged zone, as follows:

#### "T. 32 N., R. 5 W., M. D. M. Section 5.

"S. E. ¼: The average acre contains: 2 pines, 4 inches in diameter, dead. 3 pines, 4 inches in diameter, alive. 5 pines, 7 inches in diameter, cut down. 3 oaks, 4 inches in diameter, alive. Manzanita and chaparral undergrowth doing well, and shows no evidence of dying. Lots of fresh brush springing up this year, from 6 inches to 2 feet high. In this section there remains 200.97 acres of government land and the report of the official survey shows that it is third-rate and broken in character, containing scattering pine and oak.

#### "T. 32 N., R. 5 W., M. D. M. Section 6.

"S. W. ¼: The average acre contains: 1 pine, 6 inches in diameter, dead. 3 pines, 6 inches in diameter, alive. 4 pines, 10 inches in diameter, cut down. 1 oak, 8 inches in diameter, alive. Brush doing well. Fresh undergrowth all over the quarter.
"S. E. ¼: The average acre contains: 5 pines, 7 inches in diameter, dead. 1 pine, 6 inches in diameter, alive. 3 oaks, 9 inches in diameter, alive. Manzanita and chaparral brush alive. Fresh undergrowth all over the quarter.
"N. E. ¼: The average acre contains: 2 pines, 8 inches in diameter, dead. 5 pines, 7 inches in diameter, alive. 2 oaks, 9 inches in diameter, alive. There remains in this section 451.97 acres of government land. Classed in the government land survey as third-rate land with pine and oak timber.

**"T. 32 N., R. 5 W., M. D. M. Section 8.**

**"S. E. ¼:** Everything cut down. Average acre: 7 pine stumps, 7 inches in diameter, cut. New brush is starting up.

**"S. E. ¼:** The pine trees are cut down. Along the county road the brush is a little thin; but further east, towards the river, the undergrowth is doing nicely. The average count was 5 pines, 5 inches in diameter, cut down, to the acre. New undergrowth springing up everywhere.

**"N. E. ¼:** The average acre contains: 3 pines, 6 inches in diameter, dead. 2 pines, 6 inches in diameter, alive. Undergrowth growing' freely. Considerable timber has been cut on this quarter. I counted upon an average acre 6 pines, 8 inches in diameter, cut down.

**"N. W. ¼:** The average acre contains: 3 bull pines, 6 inches in diameter, dead. 2 bull pines, 6 inches in diameter, alive. 6 bull pines, 8 inches in diameter, cut down. Brush growing freely and fresh undergrowth springing up. There is left in this section 605.4 acres of government land, rated by the United States deputy land surveyor as third-rate land, broken and mountainous in character, containing pine and oak timber and manzanita brush.

**"T. 32 N., R. 5 W., M. D. M. Section 15.**

**"E. ½ of the N. W. ¼:** No perceptible damage.

**"T. 32 N., R. 5 W., M. D. M. Section 16.**

**S. W. ¼ of the S. W. ¼:** The count of an average acre is as follows: 3 pines, 8 inches in diameter, dead. 2 oaks, 10 inches in diameter, alive. Underbrush sickly; fresh brush springing up. There remains in this section but 24.27 acres of government land, and it is classed in the official report of the survey as third-rate and broken, with growth of pine and oak timber.

**"T. 32 N., R. 5 W., M. D. M. Section 18.**

**"N. E. ¼:** Everything dead or cut down on this subdivision. Counted an average of 10 pine stumps, 8 inches in diameter, cut down.

**"N. W. ¼:** Everything dead or cut down. Average acre, 7 pine stumps, 6 inches in diameter, cut.

**"S. W. ¼:** Everything dead or cut down. Average acre, 3 pine stumps, 8 inches in diameter, dead. 6 pine stumps, 10 inches in diameter, cut down. In this section there is but 305.88 acres subject to governmental control, and the majority of this has been taken up as mining land. The report of the official survey rates this land as third-class and broken; on the north and east sides containing some pine and oak timber.

**"T. 32 N., R. 5 W., M. D. M. Section 20.**

**"E. ½:** The bull pine is all dead, except down on the slope towards the river, where some pine and oak exist. All over this subdivision may be seen fresh sprouts of chaparral and manzanita.

**"W ½:** The count of an average acre is as follows: 5 pine trees, 6 inches in diameter, dead. 3 pine trees, 8 inches in diameter, cut down. Some oak, about 40 to the quarter section, still alive. The manzanita brush is all dead. Some chaparral still survives. There is still under the control of the government in this section 270.71 acres. The official report of the survey rates the land as third-rate and broken, containing scattering oak. On the north and west sides oak and manzanita brush, and on the east and south side oak, pine, and manzanita brush, are found.

**"T. 32 N., R. 5 W., M. D. M. Section 28.**

**"S. W. ¼:** The smoke has done but little damage in here to the digger pines. The count of an average acre gave me as follows: 2 pines, 8 inches in diameter, dead. 4 pines, 8 inches in diameter, alive. 4 oaks, 7 inches in diameter, alive. On the south hillside the underbrush is doing well and looks fresh. On the tops of the hills there is some undergrowth left. The pines are mostly dead, but the oak is doing well. In the gullies and gulches everything is in good shape and plenty of new brush is springing up.

"N. W. ¼: Shows some evidence of smoke. The average acre gave: 3 small pines, dead. 7 pines alive. 1 oak alive. Oak and manzanita brush alive and healthy.

### "T. 32 N., R. 5 W., M. D. M. Section 30.

"N. ½: The count of an average acre is as follows: 4 bull pine, 6 inches in diameter, dead. 8 bull pine, 8 inches in diameter, cut down. Oak doing well and average 5 inches apiece. There is some manzanita and oak brush alive, and plenty of fresh oak and manzanita starting to grow this year.

"S. ½: The count of an average acre is as follows: 4 bull pine, 6 inches in diameter, alive. 8 bull pine, 5 inches in diameter, cut down. 5 oaks, 5 inches in diameter, alive. The brush is doing well and plenty of fresh undergrowth is springing up. This section contains 606.81 acres under governmental control. The official survey classified this land as third-rate, rough, and broken, with a growth of pine and oak.

### "T. 32 N., R. 5 W., M. D. M. Section 32.

"S. W. ¼: In this subdivision there is no perceptible damage.
"N. W. ¼: No perceptible damage; if any, slight.
"N. E. ¼: A large forest fire has been through this subdivision. The smoke has been here slightly, but it is hardly noticeable. From the absence of pine snags, I conclude that there never was much timber in this subdivision."

Lewis T. Wright, a witness on behalf of the appellant company, after testifying that he has been in charge of all of its business in California since the early part of 1897, was questioned and answered as follows:

"Q. Are you familiar with its property and business at Keswick? A. Yes, sir. Q. Do you know the government lands described in the complaint in this action? A. Very generally; yes. Q. You have been over them and seen them frequently? A. Yes, sir. Q. What have you to say with regard to the character of the natural vegetation upon that land? A. The natural vegetation is scrub brush, mostly manzanita, poison oak, with occasionally valley or digger pine, and some oak. Q. Have there ever been any trees which were valuable for timber purposes upon that land during your acquaintance with it? A. Not during my acquaintance with it. Q. Are there any indications that there ever were such trees there? A. No, sir. Q. What is the value of the vegetation upon that land—the commercial value? A. Well, one would be inclined to say nothing. The land was never taken up. Q. I am referring, of course, to its original condition, its value as growing timber, before any injury was done to it by fumes or otherwise. A. Its value as growing timber for lumber purposes would have been nothing. Q. Has it any value as fuel, except what it acquired from the operations of the company? A. I cannot imagine that it would have. Q. What is the nature of the soil? A. Well, the soil—there is hardly any soil. The formation is granite. There is a slight surface of decomposed granite. Q. The vegetation grows in the crevices of the rocks and in this decomposed surface, then? A. Yes, sir. Q. Has the land any value for agricultural purposes naturally—any natural value? A. I think not.

"Q. What is the extent of the mining and smelting operations of the defendant carried on at Keswick and its vicinity? A. Approximately 200,000 tons and upwards of ore per annum. Q. Of copper ore? A. Of copper ore; that is, exclusive of fluxes. Q. Those are limestones and quartz? A. Limestones and quartz. Q. What is the output of metallic copper? A. It varies. Approximately 10,000 tons of copper per annum. It has been more. Q. How many employes earn their livelihood in Shasta county from their employment by the company? A. Some two years ago I found that we employed directly an average—a monthly average—during the year of 1,664 men. Q. Those were employed in the mining and smelting operations of the company? A. In the mining and smelting operations. Q. You own very large deposits of copper sulphide ore in that region? A. Yes, sir. Q. How do these deposits compare in extent with other deposits in California. A. Well, that would be dif-

ficult to say. It would compare very favorably with some deposits in some regions. On the other hand, there are regions with quite enormous deposits. Q. I will put it this way: How does it compare with the copper deposits which are now being worked in California? Are there other larger deposits than this—more productive? A. I do not think that there are any larger, or larger in the sense of being greater in value. I do not know that. Q. Do you know the extent of the investment of the company there? A. $6,500,000 is the capitalization, or was the original capitalization. The capitalization is now $5,000,000. Q. That represents the money which has been expended in the purchase and development of that property, does it? A. Yes, sir. Q. What is the average disbursement for wages to employes? A. Well, approximately, between $900,000 and $1,000,000 per annum. Q. In Shasta county? A. In Shasta county. Q. In addition to that you have other large purchases there? A. Yes, sir; the company purchases other ore in the district. Q. What sort of ores does it purchase? A. Almost entirely quartz, auriferous quartz. Q. What does it do with those quartz ores? A. These quartzes are combined with the copper ores of the company in the smelting operations, and the gold is thereby extracted. Q. What effect have these purchases upon the mining industry of the region? A. Well, I would say that the effect has been to make the region moderately successful as a quartz-mining region. Q. As a matter of fact, are there mines which are kept open for the purpose of supplying this company with such fluxes? A. Yes, sir; there are many such. Q. Could those mines be operated as an independent proposition unless there was a smelter there to buy their ore? A. With a very few exceptions, I should say they could not be operated.

"Q. How about the purchase of supplies? Is not a considerable part of the community indirectly supported in that manner by the company? A. Well, the existence of such a large working population naturally has developed and extended the sale of small farm produce, garden truck, poultry, eggs, and things of that kind. Q. And, of course, all domestic supplies, like groceries and similar articles? A. Domestic supplies and so on; yes. Q. What was the character of the region at and around Keswick before the company's plant was installed there? A. It was devoid of life and industry. Q. What is it now? A. It might be classed as an active and prosperous mining community. Q. What is the population of the town of Keswick? A. I can hardly say. I do not know. Q. Whatever it is, it is supported entirely by the smelting operations? A. Entirely supported by the smelting operations. Q. How about the shipments of freight to and from that point by rail? A. They have been very large. Q. Were they very large prior to the erection of the company's smelters? A. No; there was nothing there. Q. Nothing? A. No, sir. Q. The station at Keswick— A. Was established for the purpose of the operations of the Mountain Copper Company. Q. By what means is the transportation had from the mine to the smelter and to the railroad? A. By means of an independent railroad of some 12 miles in length. Q. That is owned and operated by the Mountain Copper Company? A. Yes, sir; it is the Iron Mountain Railway, operated by the Mountain Copper Company. Q. And used almost exclusively for its business? A. Yes, sir. Q. What effect has the opening of these mines had upon the mineral production of Shasta county? A. It has had quite an enormous effect upon the mineral production. The mineral production of Shasta county used to be round about $600,000 to $800,000 per annum. It jumped up to over $3,500,000. One year the output from the Keswick smelter alone was $4,800,000. Q. Was the difference that you have referred to in Shasta county's production due to the production of the Mountain Copper Company's mine? A. Yes, sir; and if the smelters were to cease I believe that the mineral production would fall below what it used to be before the establishment of the smelter. Q. Do you know whether it is contemplated to construct other smelters for copper in Shasta county? A. Well, certain companies who have purchased mines up in that region state their intention of starting smelters. Q. Are there deposits of copper ore there besides those owned by the Mountain Copper Company? A. Yes, sir. Q. Would it be practicable to operate a smelter elsewhere in Shasta county with less injury to vegetation than has been caused by the smelter of your com-

pany? A. That would depend upon the extent and size of the smelter operating; but, broadly speaking, I think I might say that it would be difficult to operate a smelter of a commercial size with less damage. Q. Would there be any place which could be selected in that region where the vegetation would be less liable and less susceptible to injury? A. No, sir; there is not, because that district is not in the timber region. Q. What has been the effect of the output of the Keswick smelter upon the mineral production of Shasta county as compared with other counties in California? A. Shasta county was, I believe, the lowest in rank as a mineral producer. Calaveras and Nevada counties were the banner counties. After the establishment of the Mountain Copper Company, Shasta county took the premier place. Q. When you say it was the lowest, you mean the lowest of those which were classed as mineral producing counties? A. Yes, sir; that is what I mean, because there may be some counties that are not classed as mineral counties. Q. So that, as the direct results of your operations, Shasta county has been raised from the lowest to the highest rank as a mineral producing county in Califorina? A. Yes, sir. Q. Relative to the taxes of the county, how large a share of the burden of taxes is borne by your company? A. I have forgotten that. I know how much we pay, and I know on what assessment we pay. Q. What is your assessment, and what do you pay per annum? A. Our assessment is $1,650,000. and we pay over $33,000 per annum as taxes upon that assessment. Q. That is a very considerable percentage, as much as a sixth or a seventh of the entire taxation of Shasta county, is it not? A. Speaking from memory, I would say it was one-sixth. Q. When were the operations of the Mountain Copper Company in that region begun? A. They were commenced on a small scale in the end of 1896, but they were seriously commenced in the beginning of 1897. Q. Have you noticed of late years any change in the area of the region affected by the fumes from the Keswick smelter? A. Yes, sir. Q. What change? A. We noticed that the area affected by the smoke is shrinking in. Q. That there is not so large an area now affected by the fumes as was affected, say, at the time of the filing of the complaint in this action. A. Very much less. Q. And that is gradually diminishing? A. Yes, sir; it is gradually shrinking in. Q. To what cause do you attribute that change? A. To the cessation of the open heap roasting. Q. What has been substituted for that? A. The roasting in closed furnaces. Q. That is the method now adopted by the company, closed furnaces? A. Yes, sir. Q. And what disposition is made of the fumes from that roasting? A. The fumes, after the deposition of dust in what are called dust chambers, are put into stacks and issue into the air. Q. What is the height of these stacks? A. One hundred and seventy feet approximately. They vary somewhat. Q. Are there more than one? A. There are four large ones and some minor ones. Q. You have studied, I take it, the course that is ordinarily followed by the fumes after they leave the flues, Mr. Wright. Can you describe what happens to the fumes after they leave the flues? A. Well, the works of the defendant are situated in what is called a canyon; in the Spring Creek canyon. The general fate of the gases is to circulate in this canyon, up and down Spring Creek canyon. Sometimes the gases overflow, or a portion of the gases overflow, from this canyon and proceed beyond. Q. Is that exceptional? A. No, sir; but the more general course of the smoke is up and down the canyon. Q. The greater portion of the fumes, then, are confined to this basin of the canyon? A. Yes, sir; they work up and down this Spring Creek canyon. They work with the sun. Q. What is the specific gravity of carbon dioxide? This is a sulphur dioxide? A. Yes. It is a little more than twice that of air. Q. You can pour sulphur dioxide into a trough, can you not, and fill the trough and expel the air from it? A. Yes, sir; that can be done. Q. That is a laboratory experiment, is it not? A. Yes. Q. To put burning candles in a trough, and then pour sulphur dioxide into the trough and extinguish the candles? A. Yes, sir. Q. Therefore, except for the stray currents of air and for the overflows, sulphur dioxide, once placed in a basin of this kind, will remain there until it is diffused or decomposed, will it? A. Until it is diffused by winds or air currents. As to decomposition, I have not followed that. Q. Well, it is taken up slowly from the atmosphere, is it not? A. It disappears. Q. Is that attributed to diffusion entirely? A. I imagine so; ultimate diffusion.

"Q. Is there any way, in your opinion, which will be less harmful to vegetation than the one which you have described for disposing of the fumes of the Keswick smelter? A. I have not been able to find any that would be practicable at Keswick. Q. The suggestion has been made by the witnesses for the government that it would be preferable to discharge these fumes from very high stacks, say to build a flue on the summit of one of the bounding hills of this canyon, to lead the fumes by a brick flue into that stack, and discharge it there at a height of perhaps 500 or 600 feet or more above the floor of the valley. What have you to say to such a disposition of the fumes? A. I think that would be distinctly dangerous. Q. For what reason. A. The area affected is now known; in fact, we know that that area is diminishing notably. If we were to discharge the fumes at a new and a higher point, I feel quite sure, from what happened in other places, that new areas not affected by smoke would be attacked, that they would be distant ones, and they might be much more valuable than those which have been attacked, and which are in the immediate neighborhood of the smelter. Q. You think it is better to bear the ills we have than fly to others we wot not of? A. I think the remedy would be worse than the disease. Q. What reason have you for thinking that injury would be done to new areas by taking a new point of dissemination of the fumes? A. I think that new air currents would be reached, and in certain conditions of the atmosphere the fumes would drop. Q. Do you find that principle laid down by any standard writer on the subject? A. Yes; I have recently examined a new work that has been published by an expert on these industrial gases in Germany, and I find a somewhat similar case cited in his book, where a smelter situated in a valley had a very high chimney attached to it. There was a change in the conditions. A large extent of country around on the higher ridges of the valley that had previously been immune then became attacked. The immediate surroundings of the smelter were spared and the vegetation began to flourish, but damage was done all around the rim of this large valley; and it is curious that this author mentions the fact that this action of the higher chimney had been predicted by a certain authority whom he cites. Q. Who is the author that you refer to? A. Haselhoff is one of the authors. Q. What is his book to which you refer? A. Haselhoff is one of the authors, and Lindan is a joint author with Haselhoff. Q. What is the book to which you refer? A. In English the title would be 'Injury to Vegetation through Smoke.' The book is in German. Q. Is this the book which was mentioned to Prof. Harkins by the United States Attorney in the course of his cross-examination in this matter? A. Yes, sir; that is the book. Q. I assume, therefore, that the volume to which you refer is familiar to the government officials. Will you refer to the page of that book upon which you found this statement which you have mentioned? A. Pages 160 to 163. Q. Have you a transcript of the paragraph there that you have mentioned? A. I can hardly say that. I have a reference only to the passage. The circumstances were as I stated. There are other cases stated in that book where high chimneys placed upon ridges, whilst undoubtedly protecting the area immediately adjacent to the chimney, do attack somewhat distant regions. Q. They extend the radius of injury, then? A. That is the result of a high chimney, that it throws the smoke farther.

"Q. What have you to say regarding the charge in the bill in this action that you have negligently failed to condense the fumes of the smelter before turning them into the air? A. No smelter is able to condense these fumes. No smelter does it. Q. Is there any American copper smelter which pursues a course substantially different from yours in reducing its ores? A. We have never heard of it. Q. You would have known of them if there were such instances? A. We should have known of them, and, when we have heard of cases that purported to offer certain advantages, we have had those cases investigated. Q. There is no condensation known for handling ores of such a quality and character? A. No, sir; not any. Q. What would be the effect upon the industry of copper smelting in America if every smelter were compelled to condense its fumes? A. The industry would have to die for some time. It would have to die until its having been the largest producer of copper in the world was forced to come again into supply, by shortage of copper

from other sources of supply which were not affected by such restrictions. Q. In other words, if I understand you, copper could never be produced in America under those conditions until the entire supply of the world elsewhere had been exhausted and it became a matter of no importance what price was charged for copper? A. Yes; that is to say, until the supplies elsewhere in the world had been proved to be insufficient to meet the demand at the increasing price of copper. Q. In other words, at the ruling prices of copper, the condensation of fumes is commercially impossible? A. Quite so.

"Q. It has been suggested that you might set up sulphuric acid works at Keswick in connection with this smelter, and turn the sulphur fumes into that acid. What comments have you to make on that suggestion, Mr. Wright? A. Firstly, the capital outlay required to put such condensation chambers in, in connection with the present smelter, would be a prohibitive outlay. Q. When you speak of the 'present smelter' you refer to the quantity smelted? A. Yes, sir. Q. What would be, in all probability, the cost of such acid works? A. It would be approximately half a million dollars for every 100 tons smelted per day. Q. And how many tons of copper are turned out per day? A. The capacity of the works is 1,000 tons of copper (ore) per day, but the average would be about 600 tons per day. That would make at least an outlay of $3,000,000. Q. From $3,000,000 to $5,000,000? A. Yes, sir; from $3,000,000 to $5,000,000. Q. As the prime cost of the plant alone? A. Yes, sir. That would not be a commercial possibility. Q. How much sulphuric acid would be manufactured from the burning of 600 tons of your ores per diem? A. Well, 700 tons per day. It would depend upon the strength of the acid, but let us say 700 tons per day of such strength as would be manufactured in such a system. Q. Of commercial acid? A. Of commercial acid. Q. Suppose you had your plant there and manufactured your 700 tons a day of sulphuric acid. What disposition could you make of it? A. We could make no disposition of it other than to carry it down by rail to San Francisco, put it into boats, and dump it into the sea. Q. What would be the cost of transporting it to San Francisco, as against the commercial value of the acid in San Francisco? A. The quantity of acid that we are speaking of, 700 tons, is seven or eight times larger than the whole of the industries in San Francisco could take care of. Q. You could not sell it, because there would be no use for it? A. There would be no market for it. Q. What is the commercial acid, say of 66° Baume, worth in San Francisco? A. From $15 to $20. Q. A ton? A. Yes, sir. Q. Less than a cent a pound? A. Yes, sir. Q. Could it be transported from Keswick to San Francisco for that money? A. With the cost of preparation in Keswick and the interest on the outlay; no, sir. Q. I am now referring only to the cost of railway transportation. Could you carry that class of freight from Keswick to San Francisco at a cost of less than a cent a pound? A. Yes, sir; it could be carried for less than that. Q. It is not a desirable article to transport, is it? A. No, sir. Q. It is very difficult to carry, and dangerous? A. It is not considered the safest article in transportation. Q. Could it be disposed of in any way at Keswick? A. No, sir; it could not. Q. Suppose you undertook to store it there, what would happen? A. That would be impracticable. Q. Why? A. Either the storage would have to be enormous, or, if it were stored in ponds or reservoirs made in that soil, the heavy rains in the winter would wash it away and wash it into the drainage system of the country. Q. What would be the consequence of large quantities of such acid getting into the Sacramento river, say? A. That would immediately dispose of all the fish. Q. Would it affect the vessels and wharves and other articles washed by the water? A. I imagine that it would. Q. Is there any mode of combining this acid with other substances so as to give it a commercial return at Keswick? A. No, sir. Q. What is the total consumption of sulphuric acid in California at this time? A. Seventy to eighty tons per day.

"Q. What would be the effect on your business if you were required to turn your fumes into sulphuric acid at Keswick? A. It would be to cause that business to suspend operations. Q. You would have to shut your smelter down and close your mine? A. We should have to shut our smelter down. Q. You could not work your mine without your smelter? A. We should not be able to work our mine unless we could dispose of the ore profitably. That is doubt-

ful. ·Q. Your present industry, as you are carrying it on, would be destroyed? A. It would be destroyed. Q. And you would have to find a market for your ores ·in some more favored community? A. Yes, sir. Q. Would it be practicable to ship your ores to any great distance? A. No, sir. Q. The values in them would not warrant any extended shipment? A. No, sir. Q. Any distant shipment? A. No, sir; the values would not justify any long transport. Q. Is this a unique condition of affairs at Keswick, or do your answers with regard to the difficulties and impossibilities of disposing of your fumes apply to smelters in general? A. They apply to smelters in general: not only to copper smelters, but lead and zinc smelters. Q. The attack, then, which the government makes upon your industry, if it should be followed up by a similar attack upon others carrying on the same industry elsewhere, would, if I understand you, result in the destruction of the copper industry of America? A. If it was successful; yes, sir. Q. I am assuming that it would be. A. Yes, sir; it would affect 6,500,000 tons of ore per annum. Q. That is to say, it would destroy that amount of production? A. Yes, sir; that is so. Q. Something has been said about the sale of pyrites; that is to say, the sale of your sulphide ores from your mines. ·Is that possible in any large quantity? A. No, sir. Q. There is no market for them? A. There is no market."

Except in respect to the possibility of so disposing of the fumes generated by the appellant's operations as to prevent injury to the lands of the complainant described in the bill, we do not find any contradiction in the record of the foregoing testimony on behalf of the appellant. We have, then, the ownership in the complainant of a little over 4,000 acres of land within the damaged zone, mountainous in character, with little or no soil, practically worthless for agriculture or horticulture, upon which most of such trees and undergrowth as existed had, prior to the commencement of this suit, been killed by the fumes generated by the appellant company (for which it is, of course, liable in damages for whatever they may have been worth), and upon which but little more vegetation of any kind remains, susceptible of destruction. In view of these facts, about which there can be no question upon the record, can it be doubted that the maximum injury that can result to the lands of the complainant embraced by the bill is but a mere trifle in comparison to the loss inflicted by the injunction in question upon the appellant company and those dependent upon and benefited by it? And, such being the case, would it be a wise exercise of the sound discretion we are called upon to exercise to sustain such injunction? We are of the opinion that it would not be, and we are not without abundant authority to sustain that position.

No one, we apprehend, will contend that the smelting of copper ores is, in and of itself, unlawful. On the contrary, it has become one of the most useful and necessary employments, especially since the use of copper, in its manifold forms, has increased so enormously, to the benefit, not only of those actually producing it, but to the state, nation, and world at large. Brickmaking is also a useful and legitimate employment. In considering and deciding a case of that sort Mr. Justice Agnew, in delivering the opinion of the Supreme Court of Pennsylvania, in Huckenstine's Appeal, 70 Pa. 102, 106 (10 Am. Rep. 669), said:

"It, as many other useful employments do, may produce some discomfort, and even some injury, to those near by. But it does not follow that a chancellor would enjoin therefor. The heat, smoke, and vapor of a brick kiln can-

not compare with those of many manufactories carried on in the very heart of such busy cities as Pittsburg and Allegheny. A court, exercising the power of a chancellor, whose arm may fall with crushing force upon the everyday business of men, destroying lawful means of support, and diverting property from legitimate uses, cannot approach such cases as this with too much caution. Its aid is not of right, but of grace, and it must be sure that the exercise of this kingly power is just, wise, and proper, before it takes from a citizen his means of livelihood, and destroys the value of his property for legitimate uses."

In Demarest v. Hardham, 34 N. J. Eq. 469, it was held that relief by injunction to restrain a business in itself lawful is not a matter of right, but rests in discretion. "The court," said the Vice Chancellor, "is bound to compare consequences. If the fact of an actionable nuisance is clearly established, then the court is bound to consider whether a greater injury will not be done by granting an injunction, and thus destroying a citizen's property and taking away from him his means of livelihood, than will result from a refusal, and leaving the injured party to his ordinary legal remedy; and if, on thus contrasting consequences, it appears doubtful whether greater injury will not be done by granting than by withholding the injunction, it is the duty of the court to decline to interfere." And, after citing various American and English cases, he concluded as follows:

"The principle to be deduced from the authorities I understand to be this: That an injunction to restrain a lawful business, on the ground that it is so conducted as to render it a nuisance, should never be granted, except the complainant shows an invasion of a clear legal right, resulting in permanent and serious injury, which cannot be adequately redressed by action at law, and that the allowance of the writ will not inflict upon the defendant a more serious injury than the complainant will sustain if the writ is denied and he be left to his ordinary legal remedy."

In Tuttle v. Church (C. C.) 53 Fed. 422, an injunction was sought to restrain the defendants from the manufacture of fish oil and fertilizers, on the ground that the smoke and offensive odors from the defendants' factory blew over the complainants' dwelling, thereby corrupting the air, destroying the comfortable and convenient use of the premises, and diminishing their value. The defendants employed 450 men in their works, and their plant was valued at $300,000. The complainants' property cost them, with improvements, $2,750, and they had offered to sell it for $3,500. Other facts are stated in the opinion in the case. Judge Colt, in refusing the injunction sought, said, among other things:

"A motion for an injunction is addressed to the sound discretion of the court, guided by certain established rules. This means that the court is to consider all the circumstances of each case before it will exercise this extraordinary remedy. Among the considerations which should influence a chancellor is the relative effect upon the parties of granting or refusing the injunction. Unless the public good calls for the injunction to issue, it should not be granted, where a large number of people are in favor of the acts to be restrained, and no serious damage to individuals is made to appear. Where the right at law is doubtful, the case resolves itself into a question of comparative injury—whether the defendants will be more injured by the injunction being granted, or the plaintiffs by its being withheld. In the present case the effect of an injunction, according to the evidence, will be to close the defendants'

works, destroy their business, and thereby cause the loss of a large amount of invested capital, while the injury to the plaintiffs if the injunction is refused, is comparatively slight."—citing a number of cases.

The nuisance complained of in Powell v. Bentley & Gerwig Furniture Co. (W. Va.) 12 S. E. 1085, 12 L. R. A. 53, was the noise of the factory. The court there said:

. "Although a court of equity in such cases follows precedent, and goes by rule as far as it can, yet it follows its own rules—and among them is the one that to abate or restrain in case of nuisance is not a matter of strict right, but of orderly and reasonable discretion, according to the right of the parti- ·cular case— and hence will refuse relief and send the party to a court of law when damages would be a fairer approximation to common justice, because to ·silence a useful and costly factory is often a matter of serious moment to the state and town, as well as to the owner."

Indeed, that the comparative convenience or inconvenience to the parties from the granting or withholding the injunction sought should be considered, and that none should be granted whenever it would ·operate oppressively or inequitably, or contrary to the real justice ·of the case, is the well-established doctrine, and we need hardly multiply authorities to that effect. Amelia Milling Co. v. Tennessee Coal Co. (C. C.) 123 Fed. 811; Sellers v. Parvis (C. C.) 30 Fed. 166; Peterson v. City of Santa Rosa, 119 Cal. 391, 51 Pac. 557; 1 Spelling on Injunctions, § 417; 2 Story's Eq. Jur. § 959; Kerr on Injunctions, 231.

In Madison v. Ducktown Sulphur, Copper & Iron Co. (Tenn.) 83 S. W. 658, it appeared that several farmers had brought suit to ·enjoin the operation of a copper smelting plant because of injury to their lands by the fumes. The plant was in a basin of the mountains. The complainants' farms were in the surrounding hills, and were far more seriously injured than have been the lands of the United States involved in the present case; for they had timber and crops which were practically destroyed. In that case it was found that the defend- ·ant company was conducting its business in a lawful way, without any purpose to injure any of the complainants, and was following the only known method by which copper smelting could be successfully carried ·on, but was unable to dispose of the sulphurous fumes, and that there was no more remote place to which its operations could be trans- ferred; that the defendant employed about 2,500 men in its works, ·supporting about 12,000 people, whereas, before the commencement of their operations, the population of the vicinity did not exceed 200; that the company paid to its employes about $1,000,000 annually for ·wages, and paid about one-half of the taxes of the county in which its property was situated, besides paying out a large amount for supplies; that if the injunction sought were granted the defendant ·company would be compelled to stop the operation of its plant and its property would become valueless. The facts in that case, which ·arose in Tennessee, were, therefore, strikingly similar to those in the case at bar, except for the important difference that there the ·complainants were actual resident proprietors, who had suffered seri- ·ous pecuniary loss. The Supreme Court of Tennessee declared that ·the controlling principle in such cases is—

"That the granting of an injunction is not a matter of absolute right, but rests in the sound discretion of the court, to be determined on a consideraion of all of the special circumstances of each case, and the situation and surroundings of the parties with a view to effect the ends of justice. A judgment for damages in this class of cases is a matter of absolute right, where injury is shown. A decree for an injunction is a matter of sound legal discretion, to be granted or withheld as that discretion shall dictate, after a full and careful consideration of every element appertaining to the injury."

And, after citing numerous authorities in support of that principle, thus applied it to the case then before the court:

"The question now to be considered is, what is the proper exercise of discretion, under the facts appearing in the present case? Shall the complainants be granted, in the way of damages, the full measure of relief to which their injuries entitle them, or shall we go further, and grant their request to blot out two great mining and manufacturing enterprises, destroy half of the taxable values of a county, and drive more than 10,000 people from their homes? We think there can be no doubt as to what the true answer to this question should be. In order to protect by injunction several small tracts of land, aggregating in value less than $1,000, we are asked to destroy other property worth nearly $2,000,000, and wreck two great mining and manufacturing enterprises that are engaged in work of very great importance, not only to their owners, but to the state, and to the whole country as well, and to depopulate a large town, and deprive thousands of working people of their homes and livelihood, and scatter them broadcast. The result would be practically a confiscation of the property of the defendants for the benefit of the complainants—an appropriation without compensation. The defendants cannot reduce their ores in a manner different from that they are now employing, and there is no more remote place to which they can remove. The decree asked for would deprive them of all their rights. We appreciate the argument based upon the fact that the homes of the complainants who live on the small tracts of land referred to are not so comfortable and useful to their owners as they were before they were affected by the smoke complained of, and we are deeply sensible of the truth of the proposition that no man is entitled to any more rights than another on the ground that he has or owns more property than that other. But in a case of conflicting rights, where neither party can enjoy his own without in some measure restricting the liberty of the other in the use of the property, the law must make the best arrangement it can between the contending parties, with a view to preserving to each one the largest measure of liberty possible under the circumstances. We see no escape from the conclusion in the present case that the only proper decree is to allow the complainants a reference for the ascertainment of damages, and that the injunction must be denied to them, except in the qualified manner" indicated

It is, we think, an entire mistake to say that the Ducktown Case can be distinguished from the present one because of the statute of Tennessee approved April 17, 1901 (Laws 1901, p. 246, c. 139), providing that, in all suits brought for the recovery of damages resulting from any nuisance, the court, exercising a sound discretion, may, upon finding that the matter complained of is a nuisance, immediately upon petition of the complainant, order or decline to order the nuisance to be abated. The Supreme Court of Tennessee set out in its opinion that statute in full, as well as section 3403 of the Code of the state of 1858, of which the act of April 17, 1901, was amendatory, and said that:

"The remedy by petition granted in section 3403, Code 1858, in an action at law, is in all respects equivalent to the remedy by injunction in equity, and, further, that the only difference is that in the first action the principal object of the suit is the recovery of damages, with the final injunction or abating order as supplementary or additional relief, while in the second the obtain-

ing of the injunction is the principal relief sought, and the recovery of damages is supplementary to or additional thereto. In other words, by the section of the Code above quoted the two courts were put upon a substantial parity in dealing with nuisances, in respect of the granting of final relief in such cases. It is observed that in section 3403, Code 1858, courts of law, abating nuisances, are required to proceed 'upon petition of plaintiff in writing, in the same manner and to the same extent as the chancery court, without resort to a court of equity for that purpose.' The petition in such a case is the exact equivalent of a bill in equity. It cannot be doubted, therefore, that although the amending acts above copied purport, in terms, to apply only to suits brought for the recovery of damages resulting from nuisances, the purpose was to declare the legislative will in respect of the use of the injunctive power in nuisance cases, when sought to be used in effecting final relief, and to ordain that in administering this relief the court should exercise a sound discretion, and either 'order or decline to order the nuisance to be abated,' as such sound discretion should dictate. This act must be regarded as declaring the policy of the state upon the subject referred to. It is perceived from the caption that the Legislature had in view the public utility of enterprises attacked on the ground of nuisance, and authorized the court to grant or withhold the injunction, as a wise discretion might suggest or warn."

In other words, the Tennessee statute conferred upon the court in an action for damages the precise power vested in it, when sitting as a court of equity, by the established principles of equity to which reference has already been made.

In the case before us the land of the complainant within the damaged zone is, according to the evidence, not timber land, and is practically worthless for agricultural and horticultural purposes, for the reason that it has little or no soil. Most of such trees and underbrush that has stood thereon had been killed prior to the beginning of this suit, and such vegetation as then remained was of very small value. The testimony in respect to the lack of value in this land of the complainant is corroborated by the circumstance that, although it is in close proximity to the railroad connecting the cities of San Francisco and Portland, and but a comparatively short distance from the towns of Redding and Shasta, yet no purchaser seems to have taken any of it at the government price of $1.25 per acre, though it has been open to purchasers for about 50 years, nor did a single homesteader, so far as appears, ever settle upon any of it during all of the years it was offered by the government as a gift to such settlers.

But one other phase of the case need, we think, be alluded to, and that is respecting the possibility of the appellant's so disposing of the fumes generated by its operations as to prevent any injury to this land of the appellee. That it is possible to convert the sulphur fumes into sulphuric acid is, of course, conceded; but that it is wholly impracticable to do so, by reason of the enormous quantity of such acid that would thus be produced, the enormous cost of such production, and the impossibility of disposing of such product, is clearly shown, not only by the testimony of the appellant's witness Wright, but by that of the appellee's witness Price, as well. The testimony of the latter witness, it is true, is also to the effect that the damage necessarily resulting from the fumes generated by the appellant's operations could be very much ameliorated by the use of such flues and stacks as have been constructed at the Washoe smelter, Anaconda, Mont. But it appears from the testimony on the part of appellant

and appellee that the main purpose of the flues and stacks so constructed at the Washoe smelter was the collection of the arsenic and antimony in the ores there, neither of which ingredients is present in the ores worked by the appellant. The appellee's expert witness, Vigeon, who was familiar with the works at Anaconda, himself testified that he could not say whether less sulphur dioxide escaped from that smelter after than before the settling chambers were put in; and the testimony of the witness Parsons, also an expert upon the subject, and of Wright, as to the effect that the construction of such flues and stacks as they have at Anaconda by the appellant would have, is that it would rather tend to enhance than to reduce the damage, in that the sulphurous fumes would thereby be carried into the higher atmosphere and, by the air currents, into new and more extended fields of damage.

For the reasons stated, the judgment is reversed, and the cause remanded, with directions to the court below to dismiss the bill.

HAWLEY, District Judge (dissenting). I am of opinion that the decree of the Circuit Court, under all the facts embodied in the record, is correct, and ought to be sustained. It was argued by appellant that the nuisance complained of is a public nuisance; that it affects all the people living in that locality—the farms, timber, agricultural lands, and the homes of all the people; that it is not specially injurious to appellee; that the damage to appellee is not different in kind and character from that suffered by the general public, except that it is less in degree; and that for these reasons appellee in its private capacity cannot maintain this suit, The answer to this contention is found in many authorities. The same argument was made by counsel in Woodruff v. North Bloomfield Gravel Mining Co. (C. C.) 18 Fed. 753, which was a suit in equity for an injunction to enjoin the continuance of a nuisance, and involved many questions similar to the case at bar. Judge Sawyer held that a public nuisance was unlawful. In the course of the opinion, he said:

"It is not unlawful as to the whole public, and lawful as to its constituents, or a part of its constituents. It is absolutely and wholly unlawful. The act being unlawful, a private party sustaining special damages from the nuisance —from the unlawful act—gains a status which enables him to maintain a private action for such injury."

In Fisher v. Zumwalt, 128 Cal. 493, 61 Pac. 82, which was an action to abate a nuisance and for damages, the defendant on his own land erected a creamery near a public highway, in a thickly populated portion of the county; there being many farm houses in the vicinity, and some 80 people living within a radius of three miles therefrom. After the erection of said creamery the defendant permitted the refuse—whey, milk, and debris—to accumulate in certain tanks, troughs, and ditches, and to stand so as to become sour and putrid in such manner as to throw off vile and noxious odors and gases, very offensive to the senses and dangerous to the health of plaintiff and his family, and all others living in the immediate vicinity. The said odors and stenches polluted the air in and about the

dwelling house of plaintiff, and at times rendered it unfit for occupation. The court said:

."There is no doubt but that there are many nuisances which may occasion an injury to an individual for which an action will not lie by him in his private capacity, unless he can show special damage to his person or property differing in kind and degree from that which is sustained by other persons who are subjected to similar injury. Among such may be mentioned the invasion of a common and public right, which every one may enjoy, such as the use of a highway, or canal, or public landing place. But this class of nuisances is confined in most cases to where there has been an invasion of a right which is common to every person in the community, and not to where the wrong has been done to private property, or the private rights of individuals, although many individuals may have been injured in the same manner and by the same means. In the one case the invasion is of a public right, which injures many individuals in the same manner, although it may be in different degrees. In the other case no public or common right is invaded; but by the one nuisance the private rights and property of many persons are injured. Because the nuisance affects a great number of persons in the same way, it cannot conclusively be said that it is a public nuisance and nothing more. The fact that a nuisance is public does not deprive the individual of his action in cases where, as to him, it is private and obstructs the free use and enjoyment of his private property. Blanc v. Klumpke, 29 Cal. 160; Yolo County v. Sacramento, 36 Cal. 195. It is provided in the Code of Civil Procedure (section 731): 'Anything which is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action. Such action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance; and by the judgment the nuisance may be enjoined or abated, as well as damages recovered.' "

It will be observed that in these cases, as well as others of a like character, the defendants were engaged in lawful occupations upon their own lands. They did not erect or conduct their operations upon any part or portion of the lands of the complainant. Nuisances are seldom, if ever, committed in that way. In the Woodruff Case the miners were conducting their mining operations in the only way that such operations were at that time conducted, and the only possible way that the hydraulic mines could be successfully carried on with profit to the owners. But it so happened that the methods used by them had the effect to deposit in the river large amounts of debris passing through its flumes and sluices; and by means of large freshets and floods that occurred on the banks of the river, from natural causes, and in part from the increased quantity of "slickens" produced by the working of the mines, the deposits were carried for several miles, and so filled up the bed of the river that it finally overflowed its banks, and deposited the gravel and sediment over the lands owned by the defendants in such a manner as created an irreparable injury thereto. That case cannot, in my opinion, be distinguished in principle from the case at bar. Unless the doctrines therein announced are erroneous, it should be followed. If the ruling in that case was wrong, it should be overruled.

In the consideration and discussion of the principles involved in this case it must constantly be remembered that the appellant is engaged in the business of mining and reduction of ores for profit and gain; that it stands upon the same level and is entitled to the same rights

that belong to every owner of private property. In the light of the authorities I am unwilling to say that the appellee could be fully compensated by an action at law for the damage committed by appellant; the damages being, in my opinion, of an irreparable nature and character.

A vast number of authorities have been cited by appellant to the effect that it is the duty of the court to consider, in determining the question whether an injunction should be issued, the relative importance of the property of the respective parties, the comparative convenience or inconvenience to the parties from granting or withholding the injunction, the locality, and the public interest. The importance to be attached to these cases depends entirely upon the particular facts established in each case, and from an examination thereof it will be found that none of the cases cited by counsel march up in their facts to the present case, but can readily be distinguished therefrom. It seems clear to my mind that the court, in Madison v. Ducktown Sulphur & Iron Co. (Tenn.) 83 S. W. 658, came to the conclusion it did by reason of the statute of that state referred to in the opinion of the court herein, which was regarded "as declaring the policy of the state upon the subject referred to." That court said:

"That the Legislature had in view the public utility of enterprises attacked on the ground of nuisance, and authorized the court to grant or withhold the injunction as a wise discretion might suggest or warn."

There is no such statute in California, and hence I do not think the case is applicable to the case in hand. If it can be said that the court based its conclusions on grounds independent of the provisions of the statute, then its conclusions are not sustained by the weight of the authorities.

The views contained in all of the other cases are summed up in 2 Wood on Nuisances (3d Ed.) p. 1182, as follows:

"The true intent of a court of equity being to do justice between parties, it will not issue a restraining order, except where the rights of the parties demand it, and in determining this question all the circumstances of location, the effect of the act claimed to be a nuisance, and the effect upon the defendant's business and interests will be considered; and, while the usefulness of the business, or its importance, magnitude, or extent, will not in all cases prevent interference, yet, if the injury on the one hand is small, and fairly compensable in damages, and the loss to the other party would be large and disastrous, an injunction will be refused and the party left to his legal remedy."

In applying these principles courts have frequently and correctly held that an injunction ought not to issue where the damage is slight or trivial. In line with these decisions I fully agree that an injunction should not issue where the injury is not shown to be irreparable; where the injury is only occasional; where the evidence is conflicting; where the title of complainant is not clear; where the evidence is doubtful whether the acts of defendant constitute a nuisance. In all such cases it is the duty of courts to consider the question of comparative injury—whether the defendant will be more injured by the injunction being granted or the plaintiff by its being withheld. But, with the exception of the Ducktown Case in Tennessee, they do not hold that, where the nuisance is of such a character as to destroy the

substance of the complainant's property, an injunction should not be granted. This is the departing line where the reason of the cases referred to stops, and is the vital point upon which I base my individual views. I am of opinion that there is a marked difference and clear distinction between cases where the injury simply depreciates the value of the property, where the plaintiff might have an adequate remedy at law, and the cases where the injury to the property is irreparable, and if continued would result in its destruction, in which event plaintiff's remedy would be in equity for an injunction.

When a plain and adequate remedy at law cannot be obtained, the power of a court of equity to enjoin a nuisance which is destructive of the property of complainant, or renders its use and occupation physically uncomfortable, is, in my opinion, no longer questionable. The jurisdiction of the court in such cases is predicated upon the broad ground of preventing irreparable injury, interminable litigation, and multiplicity of actions, and for the protection of rights. The rule by which the courts are guided in such cases is the ancient maxim that every one must so use his own property as not to injure another. The fact that appellant has built extensive works and made a large expenditure of money to enable it to successfully carry on its business, and in so doing invades the premises of other persons with the sulphurous, arsenical fumes and noxious and poisonous vapors arising therefrom, and then, when called upon to desist in the destruction of its neighbors' property, claims immunity for its business on the ground that it would be injurious to it, and might involve it in ruin, constitutes no defense to this suit, and will not protect it from the strong arm of the law; nor can appellant claim immunity on the ground that it is engaged in a profitable business which is beneficial to the community at large, nor from the fact that it has brought a large number of workmen into the neighborhood. 2 Wood on Nuisances (3d Ed.) § 802, and authorities there cited; Appeal of Pennsylvania Lead Co., 96 Pa., 116, 127, 42 Am. Rep. 534.

In 1 Wood on Nuisances (3d Ed.) § 512, the author says:

"The fact that the discomfort arising from the nuisance, or the actual tangible injury to property itself therefrom, is in no measure commensurate with the pecuniary loss to the owner of the works producing the injury, by having his works declared a nuisance, is entitled to no weight in a court of law, and is in no measure a defense, or a circumstance to be considered either by the court or jury. If a party has seen fit to erect works in the vicinity of the property of others, which may injuriously affect the surrounding property, by reason of its noxious character or results, the penalty of his temerity is to be visited upon him, however severe the loss, or however much less the damage may be to his neighbor than to himself. The innocent are not to suffer, either in their property or comfort, for the promotion of another's interest or profit. It is well said by Thompson, J., in Casebeer v. Mowry, 55 Pa. 423, 93 Am. Dec. 766: 'The amount of damage is not the sole object of an action of this nature. The right is the great question.' It will not do to hold that one man may with impunity invade the premises of another by anything in the shape of a nuisance, because the damage may not be appreciable."

And in this connection it may safely be said that in such cases the private rights of individuals and of corporations are never to be measured by their mere money value.

In Hobbs v. Amador & S. C. Co., 66 Cal. 161, 4 Pac. 1147, an injunction was issued to restrain the defendant from continuing to dump its mining debris, tailings, and other refuse matter from its mines into certain water courses, which washed the debris and material down upon and spread them over the plaintiff's land, rendering it valueless for agricultural or other purposes. The court said:

"It is no part of the general and ordinary business of a corporation to do unlawful acts. Acts which are of a continuous nature, and threaten to destroy and irreparably injure the property of another, are unlawful, and enjoinable at the suit of the person injured; not upon the ground of interfering with a lawful business, but upon the ground that every person is entitled to the protection of the law in the use and enjoyment of his property. But it is claimed that the doing of the acts restrained by the injunction are necessary to the successful carrying on of the business in which the defendant is engaged, and that, if the defendant be enjoined from carrying on its business in that way, hydraulic mining cannot be carried on at all. Yet the acts restrained are none the less unlawful, if they are injurious to the private rights of others; and the defendant is bound by law to so conduct its business as that it shall not be derogatory to the private rights of other property owners. In mining pursuits, as was said in Logan v. Driscoll, 19 Cal. 623, 81 Am. Dec. 90, 'defendant is entitled to use his mining claim in a lawful manner; but no manner can be considered lawful which precludes the. plaintiff from the enjoyment of his rights.' No person, natural or artificial, has a right, directly or indirectly, to cover his neighbor's land with mining debris, sand, and gravel, or other material, so as to render it valueless."

In Woodruff v. North Bloomfield Gravel Mining Co. (C. C.) 18 Fed. 753, 768, 806, the court, among other things, said:

"A great deal has been said about the comparative public importance of the mining interests, and also the great loss and inconvenience to these defendants, if their operations should be stopped by injunction. But these are considerations with which we have nothing to do. We are simply to determine whether the complainant's rights have been infringed, and, if so, afford him such relief as the law entitled him to receive, whatever the consequence or inconvenience to the wrongdoers or to the general public may be."

The business in which appellant is engaged is one that should be encouraged, fostered, and protected by the community and by the courts to the full extent of its legal rights under the law, as long as it conducts the same in a lawful manner. But because its business is lawful and furnishes profitable employment to many people, and is beneficial to the community at large, as well as profitable to the corporation which has invested millions of dollars in the erection of its works, it has no right to conduct and carry on its business in an unlawful manner, so as to destroy the property of the individual landowners in the vicinity or seriously to impair and injure the health of those living upon their own lands in the vicinity of its works; and when this effect is produced, the court must act to protect the rights of the individual, although the loss to them in a pecuniary sense is slight compared to that which the corporation will suffer.

An injury is irreparable when it is of such a nature that the injured party cannot be adequately compensated therefor in damages, or when the damages which may result therefrom cannot be measured by any certain pecuniary standard. Wilson v. City of Mineral Point, 39 Wis. 160, 164; Am. & Eng. Ency. of Law (2d Ed.) 361, and authorities there cited. Any injury which is of such a character as to work the destruction of the property as it has been held

and enjoyed will be treated as irreparable. 2 Story, Eq. Jur. § 928; Lemmon v. Guthrie Center, 113 Iowa, 36, 43, 84 N. W. 986, 86 Am. St. Rep. 366. The destruction of ornamental or fruit trees or timber necessary for the use of a farm, or where the timber constitutes the chief value of the land, will be prevented by injunction. No principle of law is better settled in the jurisprudence of this country than that in all such cases the owner of the land is entitled to the writ of injunction.

In Daubenspeck v. Grear, 18 Cal. 443, 447, the court said:

"There is no doubt that the plaintiffs are entitled to the equitable relief prayed for. * * * They are threatened with injuries which must, if committed, result in the destruction of their property, and it is the duty of the courts in such cases to interpose and prevent the perpetration of the injurious acts. We can hardly conceive of a more appropriate case than the present for the administration of this species of justice. The mischief against which the plaintiffs seek protection is irreparable in its nature, and destructive of interests for which no equivalent can be returned. The fact that the defendants are willing to pay for the property is immaterial, for there are no means of determining whether the value of the property in money would compensate the plaintiffs for its destruction. It may possess a value to them which no other person would place upon it; and there is neither justice nor equity in refusing to protect them in the enjoyment of it, merely because they may possibly recover what others may deem an equivalent in money. The nature of the property, which consists of fruit trees, ornamental shrubbery, etc., gives them a peculiar claim to this protection."

In Wilson v. City of Mineral Point, supra, the court said:

"That the threatened injuries which this action was brought to prevent would, if inflicted, be irreparable, in the legal acceptation of that term, and would greatly impair the just enjoyment of the plaintiff's property, is perfectly well settled. No one will seriously contend that a money compensation is an adequate remedy for the loss of the trees and shrubbery which the complaint avers the defendants threaten to destroy; and it would be a denial of justice were the courts to refuse the plaintiff the protection he asks, and thus permit his home to be permanently despoiled."

In Natoma Water & Min. Co. v. Clarkin, 14 Cal. 544, 551, the court said:

"In our judgment the right to the preventive remedy was unquestionable. The cutting, destroying, and removing of growing timber on the premises in controversy constituted, without other matter, sufficient ground for the issuance of the writ."

In United States v. Guglard (C. C.) 79 Fed. 21, 23, the court said:

"Any injury to the inheritance or substance of the estate is irreparable. Growing trees are a part of the land whereon they grow, and their destruction is an injury to the substance of the estate."

It is admitted that the decision of this court in Northern Pacific R. R. Co. v. Hussey, 61 Fed. 231, 235, 9 C. C. A. 463, based upon the principles announced in Erhardt v. Boaro, 113 U. S. 537, 5 Sup. Ct. 560, 28 L. Ed. 1113, is correct. But it is suggested that these cases and various others to which I have referred are distinguishable from the present case in this: that in each of them the defendant had entered upon the land of complainant and cut down and destroyed the trees, timber, and undergrowth thereon, or threatened to do so, while in the present case appellant has never entered upon

any part of the land of complainant and cut down or destroyed any tree, or otherwise directly interfered with complainant's freehold; that the acts of appellant which are complained of were all committed upon its own property. This is correct. But the same facts existed in the Woodruff Case, and in Fisher v. Zumwalt, supra. The acts of the defendants which constituted the nuisances there complained of were committed on their own lands. In one case the water of the river washed the debris from the mine of the defendants over the land of complainant, and thereby destroyed the substance of his estate. In the other case the defendant so conducted his creamery as to allow the whey, milk, and debris to stand in such a way as to become sour and putrid, and it threw off vile and noxious odors and gases, and these odors and stenches polluted the air, and the wind carried the same to the dwelling house of the plaintiff and rendered it unfit for occupation. In the present case appellant erected its works upon its own land, but so conducted its business as to allow its sulphurous and arsenical fumes to be carried over the land of the complainant, which poisoned and destroyed the trees and shrubbery growing thereon, and thereby destroyed the substance of appellee's estate therein. Appellant cannot relieve itself from responsibility simply because it did not bodily enter upon the land, armed with axes and dynamite, and cut down or blow up the trees and shrubbery growing thereon. The pith, point, and substance of this whole matter is that where the acts of a party, whether individuals or corporations, wealthy or poor, destroy the substance of complainant's estate, whether it be of great or of but little value, an injunction should be issued. This is the underlying principle, the essence and effect of all the decisions upon the subject which distinguish this character of cases from those where the injury is slight and trivial and the damage not irreparable and not absolutely destructive of complainant's estate.

Believing that the facts of this case show the damage to be irreparable, it is unnecessary to count the trees or shrubbery that have already been destroyed. Especially is this true in the light afforded by appellant's answer that it intends to continue its operations under the present conditions, and if allowed to do so it cannot, in my opinion, be denied that the effect will be to absolutely destroy all the growing trees still alive on complainant's land, and render the same entirely without any value.

The fact that appellant cannot convert the sulphur fumes from its works into a harmless form with any profit to itself, constitutes no defense to this suit. It clearly appears from the testimony of Thomas Price, a chemist and metallurgical engineer of extended experience and ability, that it is possible for appellant, by the use of mechanical devices which he explains, to render the fumes innocuous without converting them into sulphuric acid—at least "that the conditions could be ameliorated to a very considerable extent." This explains and justifies the action of the court below in granting appellant the privilege of applying, at any time hereafter, upon compliance with these conditions, for a modification of the decree.

This court has no power, under the laws of California, to declare that appellant can condemn the land of appellee for its individual use by paying "a just compensation" therefor, and this court is not possessed of any authority to compel appellee to sell its lands to appellant; nor has appellant pointed out in what manner the government could, if it wished to accept appellant's generous offer, dispose of its land for the purpose stated without additional legislation by Congress.