McCARTHY et al. v. BUNKER HILL & SULLIVAN MINING & COAL CO. et al.

(Circuit Court, D. Idaho. August 11, 1906.)

1. INJUNCTION—MEASURE OF PROOF REQUIRED.

Courts may grand temporary restraining orders for the preservation of possible rights upon testimony which is not convincing; but they will not grant a permanent injunction, except upon the clear establishment of those facts which justify it.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, §§ 278, 322, 387.]

2. SAME—COMPARATIVE INJURIES.

A permanent injunction will not be granted, which would necessitate the closing of mines and mills in which 10,000 to 12,000 men are employed and large capital is invested, because a comparatively small amount of damage is done by tailings therefrom discharged into a stream to lands below in times of overflow. where the mines and mills were in operation before the lands were acquired, and the owners have done all that could reasonably be done to prevent injury to others by the construction of dams and reservoirs in which the greater part of the tailings are impounded. In such case the owners of the lands will be remitted to their remedy at law by actions for damages.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, §§ 22, 23.]

In Equity. Suit for injunction.

W. T. Stoll, W. C. Jones, and E. McBee, for complainants. Albert Allen and Chas. W. Beale, for defendants.

BEATTY, District Judge. The sole question for present consideration is whether a permanent injunction shall be issued against the defendants. The issue is the same that was considered in a former hearing asking for a temporary restraining order. From the decision then rendered the following is quoted, from which the facts and issues involved appear:

"The complainants allege that about the year 1890 they entered into possession of the lands in question, which are low flat lands lying along the Coeur d'Alene River, and that the defendants through certain mining operations have rendered impure the water of said river, which, when it overflows their lands, poisons and destroys vegetation, as well as animal life, and ask an order restraining defendants from further depositing any mining débris into said river. Among the allegations of the complaint are that when they took possession of their lands the channel of said river was navigable for large boats, which was of great advantage in controlling the freight rates; also that the river was valuable for floating logs and timber to market; that from defendants' mining operations a large amount of material, including lead and other poisonous matter, is cast into said river, which by its overflow deposits upon said lands these poisoned materials, causing destruction of vegetation and the poisoning of the grass and hay with which it comes in contact; that such grass and hay, when eaten by domestic animals, cause their death, and the same result follows from their drinking of said waters; that these deposits have filled the channel of said river 'to such an extent that it is no longer well defined, and its banks rise but little above the stream at low water, so that any slight rise * * * causes it to overflow its banks'; that the channel in places has been filled more than 60 feet, so that places once navigable for large boats cannot now be navigated by even small boats; and that much waste and debris have been deposited upon said lands, but that noticeable evidence of these deposits and alleged injuries complained of has been chiefly since the year 1900.

"Upon the hearing for a temporary restraining order very many affidavits were presented, after which counsel united in a request that I make a personal examination of the premises, which I did on the 24th day of May, 1905, by visiting with counsel for both parties the dams referred to in the record at Osborn and Pine Creek, and by taking a boat at Dudley, which is a few miles below 'Old Mission,' and traveling down said river to its mouth. On this trip counsel were notified that I would submit myself to their directions and go wherever and examine whatever they asked. Admitting the allegations of the complaint as true, the conclusion would follow that these defendants, by their mining operations, are making the valleys below them a besom of waste; that the Coeur d'Alene river, beautiful in name and by nature, is being obliterated, and that soon its polluted waters must flow unvexed by prow or rudder. Had not the affidavits convinced me that these allegations were highly colored, the personal examination made would remove all doubt that some of them are absolutely untrue. After the most careful observation, no justification appeared for the charge that the channel of the river had been so filled with mining deposits or débris that it is no longer well defined, or that it has been filled 'more than 60 feet,' or that its navigation has been obstructed, or that large deposits of such débris have been made upon the lands. It should be stated that what passes from the mining mills as waste consists of rock crushed into what is known as 'tailings' of size from powder to that of small gravel; the powdered part floats in the water, giving it a milky appearance. while the coarser material sinks as soon as discharged from the milling operations and can be carried down the stream only by a strong, swift current. The water as it leaves the mill is thick with the powdered sediment and is quite milky in color, but the sediment gradually sinks and the water becomes less colored as we descend the river. There are two dams, one at Osborn and the other at Pine Creek, the latter being below all the mills, which creates reservoirs of many hundred acres in extent, beyond which none of the coarser material can possibly pass, and in which all the coarser sediment must settle, for the current through

these reservoirs is slight. The color of this fine sediment when deposited is a light gray. No great quantity of it was found below the dams, and the evidence of it decreased as we advanced down the river. Below the dams, none of the coarse tailings were found. The first place we stopped was at Bacon's ranch, where there was no evidence whatever of any mining deposits. The next was at Graff's ranch, where were about 30 acres of bad, wet land, apparently worthless. On this was a deposit. At one place was found a gray deposit about an inch thick, a sample of which I have, which I think is from the mining débris, but the greater part of the deposit was a sandy clay, rather reddish in appearance, much resembling the material found on the bank of the river some feet below the surface. Some of the counsel dug —they seemed good diggers, as well as talkers—into the bank, and into the body of the deposit on the field, to show that the two were the same and that the field deposit had been carried from the bank by a wash into the field. It is admitted there is reason for their theory. The next and last stop was at Kalanquin's ranch. Here was a tract of 75 to 100 acres of overflowed land near a lake. The deposits had some appearance of the mining débris, but less than at the last place. The indications are that some of the fine sediment carried in the water is deposited upon the lands when the overflow occurs; but, as these overflows occur only when the quantity of water is greatly increased, the proportion of sediment in it is much reduced, and I am satisfied that the amount of mining deposits is small, that there is absolutely none of the coarse material or tailings deposited, and that all the mining deposits made is small, compared with the representations thereof made by complainants.

"There was no evidence whatever to justify the assertion that the river had been greatly filled or that navigation had been impeded. The only impediment was the floating logs on their way to the mills, and the river was deep enough to float a battleship, nor is this at the high-water stage. The banks everywhere were from 4 to 6 feet above the water. A few soundings taken showed a depth of 30 feet, and those taken some time ago by Sanborn, a steamboat captain, showed as much as 40 feet in places, and he said the river is now as deep as it was in 1884, and as it was during the many subsequent years he navigated it. The wild assertions of complainants are without justification. They cannot shelter themselves behind the flimsy veil that they believed them, because so told. A man must have some reason for his belief before asserting it as a truth. It seems by some to be considered admissible practice in litigation to assert anything, regardless of the truth, that will constitute a non-demurrable case. It is a duty that counsel owe to the courts to see that their clients present to them only the truth. Courts will endeavor to see that no man shall succeed through misrepresentation. It must be concluded either that these complainants intended to deceive the court, or were themselves deceived by their own culpable negligence. In either event a court of equity would not be justified in granting the relief they ask. Turning, now, to the affidavits filed in the case, we find them directly contradictory. Upon one side the chemists say the water is impregnated with poisonous ingredients. The medical experts say the live stock dies from drinking the water and eating the vegetation grown upon these overflowed lands; that a Spokane dog died in an hour after drinking the water. Upon the other side are an equal number of apparently equally competent chemists, medical experts, and others who say the waters are not poisoned, that animal death is not caused from poisoned waters or vegetation, that live stock in the neighborhood of the mills, where the water necessarily must be more impregnated, habitually drink the water, and Wallace and Wardner dogs drink it with impunity, and both stock and dogs, instead of dying by its use, thrive upon it. It is utterly impossible from the evidence in this case for any court to justify itself in issuing a restraining order.

"But, admitting that complainants have suffered injury, and may suffer more, from the causes alleged, there is a potent reason why the court should exercise its discretion against the issuing of a restraining order. Without detailing the reasons, such an order would mean the closing of every mill and mine, of every shop, store, or place of business, in the Coeur d'Alenes.

There are there about 12,000 people, the majority of whom are laboring people, dependent upon the mines for their livelihood. Not only would their present occupation cease, but all these people must remove to other places, for the mines constitute the sole means of occupation, and when they finally close, Wallace and Wardner, Gem and Burke, and their surrounding mountains will again become the abode only of silence and the wild fauna. Any court must hesitate to so act as to bring such results."

Since the former hearing over 1,400 pages of testimony have been taken, which with the oral arguments and the carefully prepared and able briefs of counsel were, at the last term of court, submitted for consideration. After examination of the same, a different conclusion from that before reached would not be justified. Even if this testimony could be held as changing the former testimony by affidavits, I know from my personal examination, made at the request of both parties as stated, what the facts are as to the real damage or injury, so far as disclosed by inspection of the premises. It is admitted that, for the preservation of possible rights, courts may grant temporary restraining orders upon testimony which is not convincing; but they will not grant a permanent injunction, except upon the clear establishment of those facts which justify it. It is not necessary to here review the testimony, but it is held insufficient to establish the alleged injury to complainants or to authorize the injunction asked.

There are reasons why this injunction should not be granted, even if complainants had established their allegations of injury. The defendants had commenced their mining operations, including the building of mills and the use of the said river complained of, long before the complainants had settled upon the lands, and even after settlement they long occupied them before making complaint of defendants' actions. I do not, however, agree with defendants' contention that such prior occupation by them gives them the right to use the river as they please. Their mining operations must be so conducted as to protect as far as possible the rights and properties of others. They have not, however, ruthlessly destroyed complainants' property, but have attempted to protect it by building the dams and reservoirs to impound the tailings. The appellate court of this circuit in Mountain Copper Co. v. United States (C. C. A.) 142 Fed. 630, says:

"It is quite true that it is a maxim of the law that every one must so use his own property as not to interfere with that of another. But, where one cannot use his own property at all without indirectly injuriously affecting the property of another, then the sound discretion of the court of equity that is appealed to, to abate the nuisance, is invoked, and should be wisely exercised."

Another important matter for consideration is the relative injury to the parties to the litigation. The granting of injunctions is generally somewhat within the discretion of the court. All the circumstances must be considered. It is true that there are many complainants, with a large aggregate interest in farming lands, to which the damage from defendants' operations may be very great, and certainly will be, if complainants' allegations are true. On the contrary, if this injunction is granted, it must result in the closing, not only of the mills, but also of the mines. Generally the ores are of such low grade that they cannot profitably be shipped until concentrated;

hence the mills must be operated. If they are, the water used in them must finally reach the said river, bearing such sediment as it is impossible to impound in the reservoirs. The court must consider the consequences of closing these mills and mines. It must bear in mind the very great hardship and loss to the defendants. They have many millions of dollars invested in their properties and are now conducting an immense business, which is not only of much profit to them, but also of great business interest to others. But of equal consideration is the fact that it would deprive thousands of laborers of employment who are now earning good wages; also there are many others engaged in various avocations who would be seriously affected. I presume it is safe to say that there are 10,000 to 12,000 people who are now earning a livelihood through the operation of these mines and mills, all of whom would be seriously injured by an injunction. The court will long hesitate before taking such a drastic mode of guarding complainants' interest as would result in incalculable injury, not only to defendants, but also to large communities.

None regret more than the court if these complainants are suffering injury; but, if they are, they are not without remedy. That is indicated in New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820. Instead of granting an injunction, and thus putting a defendant at the mercy of a complainant to demand what he pleases, the court held that complainant's remedy was to recover such damages as he could show he had suffered. It was intimated that an injunction would have been granted, had it been asked before the defendant had made its improvements; but a delay of two years occurred and until the work had far advanced. A like situation exists here. I am clearly of the opinion that the complainants should not have an injunction, but should rely upon the recovery of such damages as they have suffered, and the injunction is therefore refused, which conclusion seems supported by Mountain Copper Co. v. United States (C. C. A.), 142 Fed. 625, and some other authorities that might be discussed, but from which I refrain.

The complainants may have such reasonable time as they desire and ask to take any further action they deem best.