MAEHL et al v. CROW CREEK CONSOL. MINING CO.

(Third Division.   Valdez.   September 21, 1916.)

No. 736.

1. INJUNCTION &⟶13—MINES AND MINERALS—SUBSTANTIAL INJURY.
   Plaintiffs brought this action to enjoin defendant from dumping tailings on their placer claims, which lie along the creek below defendant's workings. Plaintiffs' claims are shown to be nonproducing and speculative, and of doubtful, if any, value. Defendant's claims are producing and have long employed a large number of miners at work. The high waters of the creek carry glacial débris, sand, and gravel, in large quantities, and it is not shown that the workings of defendant produce any appreciable additions to the natural deposits of this débris on the plaintiffs' claims. *Held*, the rule of comparative injury ought to be followed, and the plaintiffs relegated to their action at law for damages if any. Injunction denied.

2. INJUNCTION &⟶13—EQUITY.
   No one has an absolute and unqualified right to an injunction. Such an application appeals to the conscience of the chancellor, to the exercise of a wise and sound discretion, and should be granted or withheld according to the equities of the case as made to appear from the records. Where it is sought to enjoin a lawful business, the court should give due consideration to the comparative injury which will result from the granting or the refusal thereof.

---

&⟶See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. INJUNCTION ⚙➔113—LACHES—REMEDY AT LAW.

    . On application for an injunction the court should consider the necessity or importance of the right claimed, as well as the injury likely to be caused by its issue; and where it appears that there was a lack of diligence in seeking the aid of the court of equity to arrest the detrimental operations, an injunction will be refused, and the party relegated to his remedy at law for damages.·

Plaintiffs bring this action for an injunction to restrain defendant from dumping tailings and débris from their placer mine on Crow creek, a tributary of Glacier creek, upon plaintiffs' placer ground on said last-named creek, which runs into Turnagain Arm.

Plaintiffs claim to own 17 placer claims, aggregating about 340 acres.

Defendant owns a number of placer claims, which it is working quite extensively, above plaintiffs' ground.

Some of the claims of both plaintiffs and defendant were located many years ago—as early as 1902, or 14 years ago. Defendant owns two claims, each about 1,620 feet in length along said Crow creek, between its present workings and the upper ground of plaintiffs, upon which it claims its tailings are mostly deposited. Most of this length of the creek runs through a high box canyon. There is some difference in the testimony as to the amount of water running in the creek; but plaintiffs' witness Oldham estimates it at about 5,000 to 10,000 miner's inches running through Crow creek, where it empties into Glacier creek; about 20,000 miner's inches of water in Glacier creek above the junction with Crow creek, and about 30,000 miner's inches in Winner creek, which flows into Glacier creek just above the junction of Crow and Glacier creeks. This would make about 55,000 miner's inches of water flowing through plaintiffs' ground at a normal stage, and the testimony shows that at high water there is a tremendous volume of water in said streams; one witness putting it as high as 250,000 miner's inches.

Defendant has mined its ground by hydraulic quite extensively during the past 7 or 8 years, having expended about $300,000 during said time, and the improvements now on its ground are valued at about $100,000.

The evidence shows that a considerable amount of gravel and débris is carried down said streams and over and upon plaintiffs' claims. How much of this is natural wash, or rather how much of it would be washed down by the floods occurring in said streams, and how much can actually be traced to the operations of defendant company is difficult, if not impossible, to determine.

The said Crow creek, Glacier creek, and Winner creek all have their source in and are fed from many glaciers. As is well known, in the glaciated portions of Alaska, at certain times in the summer season, due either to warm weather or warm rains, these glacier streams become very high and carrying down immense quantities of sand, gravel, silt, and other débris, overflow the more level country below, and fill up and cause large deposits of these materials.

No actual mining work has ever been done on plaintiffs' ground, although plaintiffs claim to have done the annual assessment work during all these years. No gold has ever been extracted, and plaintiffs have held said ground apparently with the speculative hope that some time it could be worked by dredge or some other economical process.

In 1914 defendant's witness, Arthur Jett, a hydraulic engineer, testified that he operated a Keystone drill on plaintiffs' ground, testing it to ascertain if a dredger would pay thereon. This work was done by Charles Herron and others, and Jett had an interest in the enterprise, instead of receiving a salary for his work. He put down six holes, each being from 30 to 50 feet in depth. From the gravel recovered in the core of the drilling, amounting to $4^7/_{11}$ cubic yards of gravel, there was obtained 21 cents worth of gold, or about 4.9 cents per cubic yard. This witness testified that there would have to be a value of from 50 cents to $1 per cubic yard in order to pay for establishing and operating a dredging machine on this ground; that the cost of a suitable dredge would be $250,-000 to $300,000, exclusive of power plant. Upon beginning said drilling, the witness Jett and associates located some placer claims adjoining plaintiffs' ground, and after ascertaining the results of said drilling they abandoned the same and did not even record the location certificates.

E. E. Ritchie, of Valdez, for plaintiffs.

L. V. Ray, of Seward, for defendant.

BROWN, District Judge.   In the case of McCarthy v. Bunker Hill & Sullivan Mining, etc., Co., 164 Fed. 940, 92 C. C. A. 272, the court says:

"To an injunction, however, even on final hearing, no one has an absolute and unqualified right.   Such an application appeals to the conscience of the chancellor, to the exercise of a wise and sound discretion, and should be granted or withheld according to the equities of the case as made to appear from the record.   Each case must be considered and made to depend upon its own particular facts and circumstances, in the consideration and determination of which the general rules governing courts of equity are to be borne in mind and applied.   Among those rules is the well-established one that an appellate court will not ordinarily interfere with the action of the trial court in either granting or withholding an injunction in cases in which the evidence is substantially conflicting, and especially where the trial judge, at the request of the respective parties, has had the benefit of a personal inspection of the premises.   Nor should an injunction be granted in any case where it will necessarily operate contrary to the real justice of the case.   Furthermore, where, as in the present case, it is sought to enjoin a lawful business, the court should give due consideration to the comparative injury which will result from the granting or refusal of the injunction sought. We so held in the case of Mountain Copper Co. v. United States, 142 Fed. 625, 73 C. C. A. 621, and the Supreme Court of the United States has so held in several cases, and in three very recent and very important ones."

In the case at bar, the rule of "comparative injury" ought to be followed.   It is true there are not "thousands of men to be affected or thrown out of employment," nor "large communities injured seriously in a business way," for there are no large communities in that portion of Alaska.   The defendant employs about 30 men and is adding considerably to the gold production, which goes into the arteries of commerce and helps that much in the industry of the world.   The country surrounding this property is absolutely worthless for any purpose except for mining.   It is composed of gravel flats and flood plains, of no value except where gold occurs in sufficient quantities to make it valuable for mining purposes.   The best proof of the little value of plaintiffs' property is the fact that, although it has been located for many years, some of the claims for 14 years, no mining have ever been prosecuted thereon, and no gold extracted.

The day has gone by when large tracts of land can be held out of use for speculative purposes.   The Land Department

of the United States, having disposition of the public lands, has during the past 10 years made a radical change in its policy in that regard and valid mining locations can now be made and held only upon a bona fide showing of actual and not speculative value.

This case appears to be one where the plaintiffs ought to be relegated to their action at law for damages, and not attempt to hold up and stop beneficial and important mining operations on the pretense that it is a great injury in adding somewhat to the burden of tailings and débris that flow over and upon their alleged mining claims, where those mining claims are not shown in this action to have any appreciable value.

Then, too, while plaintiffs claim that it is only within the last year or two that such large quantities of débris have been washed down said streams upon their land, nevertheless they have known of the large investments made, and when they were about to be made, by defendant, and of the extensive work carried on by defendant for 7 or 8 years, and they made no move to prevent the threatened injury; therefore the principle of estoppel ought to be invoked by reason of the laches of plaintiffs.

In Lindley on Mines (3d Ed.) vol. 3, § 842, it is said:

"The court should consider the necessity or importance of the right claimed, as well as the injury likely to be caused to the complaining party. The court will also, of course, always take into serious consideration the conduct and attitude of the parties complaining, and where it appears that there was a lack of reasonable diligence in seeking the aid of a court of equity to arrest the detrimental operations, an injunction will be refused and the party relegated to his remedy at law for damages."

The application of the plaintiffs for an injunction will therefore be denied, but without prejudice to plaintiffs' right to maintain an action at law for damages.